IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNDER ARMOUR, INC.,** * | |
| * | |
| Plaintiff, * | |
| * | |
| v. * | Civil Case No. SAG-20-03427 |
| * | |
| **EXCLUSIVE INNOVATIONS, INC.,** * | |
| * | |
| Defendant. * | |
| * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Under Armour, Inc. ("Under Armour") filed this action against Exclusive Innovations, Inc. ("Defendant") on November 24, 2020, alleging trademark infringement and trademark dilution under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a)(1)(A), (c), trademark infringement and unfair competition under the Annotated Code of Maryland, Business Regulation Article § 1-414 and Maryland common law, and cybersquatting under the Anti-cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). ECF 1. After Defendant failed to plead or otherwise defend itself, Under Armour sought an entry of default, which was issued by the Clerk on March 30, 2021. ECF 8, 9. Currently pending is Under Armour's motion for default judgment. ECF 11. Defendant has not filed a response, and the time for doing so has passed. *See* Loc. R. 105.2a (D. Md. 2018). No hearing is necessary. *See* Loc. R. 105.6. For the reasons explained below, the Court will grant Under Armour's motion as to Defendant's liability, issue a permanent injunction, and order Defendant to pay statutory damages and costs.

### I.   FACTUAL BACKGROUND

Under Armour is a well-known provider of athletic apparel, sporting goods, and accessories. ECF 1 ¶¶ 8–10. It uses and promotes various marks to sell its products including the

name/mark "UNDER ARMOUR," "ARMOUR," and other "ARMOUR"-formative marks such as "GAMEDAY ARMOUR, BABY ARMOUR, OFFSHORE ARMOUR, SUN ARMOUR, ARMOUR STRETCH, ARMOUR GRABTACK, ARMOUR FLEECE, ARMOUR SELECT, ARMOUR ELITE, ARMOUR ACCESS, ARMOURBLOCK, ARMOURSTORM, ARMOURLOFT, ARMOURGROUP, ARMOURSIGHT, ARMOURSTEALTH, ARMOURBOX, and MY ARMOUR." *Id.* ¶ 11.  Several of these marks are registered with the U.S. Patent and Trademark Office and the Secretary of State of the State of Maryland.  *Id.* ¶¶ 28-30; ECF 1-1; ECF 1-2.  One such registered trademark, "INNER ARMOUR," has been used by Under Armour's licensee in connection with the promotion and sale of dietary and nutritional supplements since 2004.  ECF 1 ¶ 12; ECF 1-2 at 2.

Under Armour has sold billions of dollars of merchandise under its ARMOUR and UNDER ARMOUR marks through its own retail outlets, as well as at nationwide retailers like Foot Locker, Dick's Sporting Goods, Macy's, Bass Pro Shops, and many others.  ECF 1 ¶ 14.  Its products are also promoted on its website and the websites of various retailers, in mail order catalogs, and in advertisements on television, the Internet, print publications, and billboards, as well as through sponsorships with various celebrities and sports teams.  *Id.* ¶¶ 15–22.  The Trademark Trial and Appeal Board of the United States Patent and Trademark Office has expressly acknowledged in an official ruling that the UNDER ARMOUR mark "is famous in the field of sporting goods and clothing.  *Id.* ¶ 26; *Under Armour, Inc. v. Bode*, Opp. No. 91178653 (T.T.A.B. 2009).

Defendant has been selling and promoting vitamins and supplements under the name "LIFE'S ARMOUR," without Under Armour's authorization.  ECF 1 ¶ 31.  It registered the domain name https://lifesarmour.com/ with the GoDaddy domain name registrar in or around May,

2017.  *Id.* ¶ 34–35.  Defendant uses this website to sell its products.  It also touts "LIFE'S ARMOUR" as a "lifestyle brand" that promotes "stylish fitness apparel" on this website and on its various social media accounts.  *Id.* ¶¶ 32, 36.  Defendant's products and online materials are branded with the mark "LIFE'S ARMOUR" in a font that looks similar to the UNDER ARMOUR mark.



*Id.* ¶¶ 2, 31.  Additionally, the products and website contain a "Shield" logo that has an "L" and an "A" in it, which Under Armour alleges bears some resemblance to its "UA" mark:

*Id.* ¶ 33.  The imagery accompanying these marks on Defendant's website and its Facebook, Instagram, and Twitter pages portray people engaging in high intensity physical activities, similar to Under Armour's ad campaigns.  *Id.* ¶¶ 18, 22, 33, 36.

      Defendant applied for a trademark from the U.S. Patent and Trademark Office for the mark "LIFE'S ARMOUR" on November 28, 2017.  U.S. Trademark Application Serial No. 87699080.  On February 27, 2018, Under Armour sent a demand letter to Defendant asserting its rights and

asking Defendant to stop using LIFE'S ARMOUR or other ARMOUR marks and to abandon its trademark application. ECF 1 ¶ 38. Because Defendant did not respond to Under Armour's letter, Under Armour filed a Notice of Opposition against Defendant's trademark application on May 16, 2018 (Opposition No. 91241571) based on Under Armour's prior rights in its ARMOUR marks. *Id.* ¶ 39. While the opposition was pending, the parties discussed a potential resolution of the matter. *Id.* ¶ 40. During these negotiations, around October, 2018, Defendant deactivated its website. On January 13, 2019, citing Defendant's "apparent loss of interest" in the proceeding, the Trademark Trial and Appeal Board entered a judgment against the Defendant, sustaining Under Armour's opposition to the application. *Id.* ¶ 39; *Under Armour, Inc. v. Exclusive Innovations Inc.*, Opp. No. 91241571 (T.T.A.B. 2019). Soon after this judgment was entered, Defendant refused to respond to Under Armour's requests to finalize the terms of a settlement. ECF 1 ¶ 41. After a year of dormancy, Defendant has reactivated its website and continues to promote its "LIFE'S ARMOUR" brand and products. *Id.* ¶ 43.

## II.     LEGAL STANDARD

Rule 55 of the Federal Rules of Civil Procedure governs default judgments. Once a default has been entered by the Clerk against a party who "has failed to plead or otherwise defend" itself in an action against it, the plaintiff may move for a default judgment. Fed. R. Civ. P. 55(a)–(b). In considering such a motion, the Court "accepts as true the well-pleaded factual allegations in the complaint as to liability." *Entrepreneur Media, Inc. v. JMD Ent. Grp., LLC*, 958 F. Supp. 2d 588, 593 (D. Md. 2013); *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780–81 (4th Cir. 2001) ("The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact . . . ." (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975))). The Court then determines "whether these unchallenged factual allegations constitute a

legitimate cause of action." *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 494 (D. Md. 2010). If the Court finds the defendant is liable, then the court must determine the appropriate relief, which may entail an independent assessment of any damages claimed. *Ryan*, 253 F.3d at 780–81; *Entrepreneur Media*, 958 F. Supp. 2d at 593; *Living Legends Awards for Serv. to Human., Inc. v. Hum. Symphony Found.*, No. PX 16-3094, 2017 WL 3868586, at *3 (D. Md. Sept. 5, 2017).

### III. ANALYSIS

Under Armour has accused Defendant of trademark infringement under state and federal law, trademark dilution, and cybersquatting and seeks injunctive relief, statutory damages, and costs and attorneys' fees. The Court first discusses Defendant's liability for each of Under Armour's claims and then turns to the appropriate remedies.

#### A. Trademark Infringement Liability

Defendant is liable for trademark infringement. Under Armour's First, Second, Fourth, and Fifth Claims for Relief are all trademark infringement claims. The First and Second Claims are premised on 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a)(1)(A) respectively, and the Fourth and Fifth Claims arise under Maryland statutory and common law. To establish a federal trademark infringement claim, plaintiff must show "(1) that it owns a valid mark; (2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a)). The test for false designation or unfair competition under § 1125(a)(1)(A) is essentially the same. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930, (4th Cir. 1995); *Entrepreneur Media*, 958 F. Supp. 2d at 594. Likewise, "[t]he test for trademark

5

infringement and unfair competition under [Maryland] state law is the same as the test under the [federal statute]." *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 460 (D. Md. 2002) (citing *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 422 (4th Cir. 1998)); *accord Mid S. Bldg. Supply of Md., Inc. v. Guardian Door & Window, Inc.*, 156 Md. App. 445, 460 (2004) ("It is clear that trademark infringement cases under either the Maryland statute or the Lanham Act . . . require the same proof."). To determine the likelihood of confusion to consumers, Courts in the Fourth Circuit consider nine factors:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of defendant's product; and (9) the sophistication of the consuming public.

*Rosetta Stone* 676 F.3d at 153 (quoting *George & Co., LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009)).

Under Armour's well-pleaded complaint supports all elements of its trademark infringement claims. First, Under Armour has alleged that it owns several valid, registered ARMOUR marks, including the mark "ARMOUR" for sports and fitness apparel and the mark "INNER ARMOUR" for dietary and nutritional supplements. ECF 1 ¶ 12, 28–29; ECF 1-1; ECF 1-2; ECF 1-3. Registration of a trademark is "prima facie evidence of the validity of the registered mark" and "the registrant's ownership." 15 U.S.C. § 1115(a); *accord Living Legends*, 2017 WL 3868586, at *3. Second, Under Armour has alleged that Defendant used a similar mark in commerce without Under Armour's consent by using "LIFE'S ARMOUR" on its products and website without Under Armour's prior approval and against Under Armour's explicit demands. ECF ¶¶ 31–33, 38–42. Third, Under Armour has alleged Defendant has used LIFE'S ARMOUR in connection with the sale and advertisement of its vitamins and supplements. *Id.* ¶¶ 31–33.

Finally, Under Armour has alleged that Defendant's use of LIFE'S ARMOUR is likely to confuse consumers. *Id.* ¶¶ 44, 47, 49, 51, 56, 59. Several of the factual allegations in Under Armour's Complaint support a finding of a likelihood of confusion under the Fourth Circuit's nine-factor test. Specifically, Under Armour has alleged facts that support the first, second, third, and fifth factors. First, Under Armour alleges that its ARMOUR marks are incredibly well-known and distinctive due to its expansive advertising in all forms of media and the high level of sales it has generated for years from its marks at retail locations and online stores across the country. *Id.* ¶¶ 8–27. As to the second factor, Under Armour's Complaint includes pictures comparing the "UNDER ARMOUR" mark and the "LIFE'S ARMOUR" mark, which use similar-looking font styles. *Id.* ¶¶ 33. Considering the third factor, Under Armour has alleged that, like Under Armour, Defendant promotes fitness apparel. Additionally, Defendant sells a line of nutrition supplements. *Id.* ¶ 31. Although Under Armour does not claim to sell nutrition supplements itself, its licensee does under the registered trademark "INNER ARMOUR." *Id.* ¶¶ 12, 29. As to the fifth factor, the similarity in advertising, Under Armour's complaint includes examples of its own advertising, the advertising by its licensee, Inner Armour, and Defendant's advertising, which all similarly depict athletic-looking individuals wearing fitness attire and engaging in high-intensity physical activities. *Compare* ECF 1 ¶ 18, 22 (depicting Under Armour's products and advertising); *and id.* ¶ 12 (depicting Under Armour's licensee's products and advertising); *with id.* ¶¶ 33, 36 (depicting Defendant's LIFE'S ARMOUR products and advertising). Accepting the factual allegations in the complaint as true, the factors discussed strongly weigh in favor of finding a likelihood of consumer confusion. The facts alleged in the complaint do not suggest whether the other factors considered by the Fourth Circuit should weigh in favor or against a finding of likelihood of confusion. However, this judicially created list is not "exhaustive or mandatory." *Rosetta Stone*,

676 F.3d at 154 (rejecting plaintiffs claim that it was reversible error for the district court not to address each factor). Not every factor will always be weighted equally, and some factors may not be relevant in a given case. *Id.*; *see also Synergistic Int'l., LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006) (explaining that "there is no need for each factor to support [plaintiff's] position on the likelihood of confusion issue"); *Entrepreneur Media*, 954 F. Supp. 2d at 595 (granting default judgment for trademark infringement claim based on some, but not all, of the nine factors). The Court is satisfied that Under Armour has alleged sufficient facts to find Defendant's use of LIFE'S ARMOUR is likely to confuse consumers. Therefore, the Court will enter default judgment against Defendant on Under Armour's First, Second, Fourth, and Fifth claims for relief.

### B. Trademark Dilution Liability

Defendant is also liable for Trademark Dilution. Whereas the prohibition of trademark infringement is concerned primarily with preventing consumer confusion, the prohibition on trademark dilution protects trademark owners from "the whittling away of the established trademark's selling power and value" through unauthorized use. *Rosetta Stone*, 676 F.3d at 167 (quoting *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 111 (2d Cir. 2010)); *see* 15 U.S.C. 1125(c) (allowing an injunction from using a famous mark, "regardless of the presence or absence of actual or likely confusion"). To establish trademark dilution, a claimant must show:

> (1) that the plaintiff owns a famous mark that is distinctive;
> (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark;
> (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and
> (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark.

*Rosetta Stone*, 676 F.3d at 168 (quoting *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264–65 (4th Cir. 2007)).

Again, Under Armour's Complaint satisfies these elements. First, Under Armour's marks are famous in the United States due to its national advertising, celebrity sponsorships, and the number of in person and online retail locations. ECF 1 ¶¶ 8–10, 14–27. Second, Defendant has used LIFE'S ARMOUR in commerce to sell its products. *Id.* ¶¶ 31–33. Third, the LIFE'S ARMOUR and UNDER ARMOUR marks are similar. They both contain the word "ARMOUR," spelled in its less common form in the United States. They also both use similar font styles and are both used in the promotion of products for athletes or those seeking to adopt an athletic lifestyle, giving rise to an association between the marks.[1]  *Id.* ¶¶ 33–36.

Finally, the facts alleged show Defendant's use of LIFE'S ARMOUR is likely to dilute the distinctive quality of Under Armour's famous mark. *Id.* ¶ 53. The Lanham Act provides six factors the court may consider in determining whether some unauthorized use is likely to cause trademark dilution by blurring. *See Rosetta Stone*, 676 F.3d at 170 (quoting 15 U.S.C. § 1125(c)(2)(B)). The Fourth Circuit has explained that "[n]ot every factor will be relevant in every case, and not ever blurring claim will require extensive discussion of the factors." *Id.* (quoting *Louis Vuitton*, 507 F.3d at 266). The Court finds that some of the factors enumerated in § 1125 are both relevant and strongly favor finding blurring in the instant case, specifically, the "degree of similarity between the mark or trade name and the famous mark," the "degree of inherent or acquired distinctiveness of the famous mark," and the "degree of recognition of the famous mark."[2]  *See* 15 U.S.C. § 1125(c)(2)(B)(i)–(ii), (iv). The UNDER ARMOUR name and

---

[1] While this Court is less persuaded of the similarity of the logos, it need not address that issue in resolving this motion, because liability has been established on other grounds.
[2] The other factors outlined in the statute are "[t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark," "whether the user of the mark or trade name intended to create an association with the famous mark," and "[a]ny actual association between the mark or trade name and the famous mark." 15 U.S.C. § 1125(c)(2)(B)(iii), (v)–(vi).

LIFE'S ARMOUR name both use the British spelling of the word "armour" and a similar-looking wide-set, all capitalized font. *See* ECF 1 ¶ 33. The UNDER ARMOUR mark is exceedingly distinctive, famous, and recognizable. *Id.* ¶¶ 14–27. Under Armour has won numerous awards for its advertising and brand value, finding its place on Forbes list of "The World's Most Valuable Sports Brands" more than once. *Id.* ¶ 25. The brand has also been promoted by world-famous athletes like Olympic medalist Michael Phelps, NBA star Steph Curry, NFL legend Tom Brady, and principal ballerina Misty Copeland among many others. *Id.* ¶ 22. Therefore, the Court finds Defendant's use of LIFE'S ARMOUR is likely to dilute Under Armour's marks. Default judgement will be entered against Defendant on Under Armour's trademark dilution claim.

### C. Cybersquatting Liability

Finally, Defendant is liable for cybersquatting. The Anticybersquatting Consumer Protection Act protects trademark owners from certain kinds of online exploitation of their marks, referred to as "cybersquatting." *See* 15 U.S.C. § 1125(d); *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 267 (4th Cir. 2001). To establish cybersquatting, a plaintiff must show (1) that the defendant had a bad faith intent to profit from using the plaintiff's mark and (2) that the defendant registered, trafficked, or used a domain name that is either confusingly similar or dilutive of the plaintiff's mark. *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 434 (4th Cir. 2011) (quoting *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367 (4th Cir. 2001)).

The statute provides nine non-exhaustive factors a court may consider in determining whether a party acted with bad faith:

> (I)    the trademark or other intellectual property rights of the person, if any, in the domain name;

- (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

- (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

- (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

- (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the good will represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

- (VI) the person's offer to transfer, sell or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

- (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

- (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

- (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i)(I)–(IX).

The first four factors are those that can "suggest circumstances tending to indicate an absence of bad faith." *Applause Prod. Grp., LLC v. Showtime Events Inc.*, No. GJH-16-1463, 2017 WL 1906588, at *5 (D. Md. May 4, 2017) (quoting *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 432 (S.D.N.Y. 2013)). Here, one of these factors—use of the domain name

in connection with the bona fide offering of goods—weighs towards finding an absence of bad faith in this case. As Under Armour's complaint indicates, Defendant used the domain name https://lifesarmour.com/ to sell its supplements and apparel. ECF 1 ¶ 35. However, the other factors that could indicate an absence of bad faith are not present here. Defendant has no trademark or other intellectual property rights in the domain name. Defendant sought a trademark for "LIFE'S ARMOUR," but its application was ultimately denied by the Trademark Trial and Appeal Board. *Id.* ¶¶ 38–39. The domain name does not include Defendant's legal name, "Exclusive Innovations, Inc," and the Court is unaware of any noncommercial or fair use of the mark.

The next four factors can "tend to indicate that such bad faith does exist." *Applause*, 2017 WL 1906588, at *5. Three of those factors are absent in this case. Under Armour does not claim that Defendant offered to sell the domain name without having used it for the bona fide sale of its products, that Defendant provided false information when registering for the domain name, or that Defendant registered multiple domain names. However, Under Armour's allegations do suggest that Defendant intended to profit from Under Armour's marks by diverting users to its own website and creating confusion over whether UNDER ARMOUR has an affiliation with or has provided endorsement of LIFE'S ARMOUR. ECF 1 ¶¶ 62, 64–67.

Finally, the last factor outlined in the statute "points in either direction, depending on the degree of distinctiveness and fame of the mark." *Applause*, 2017 WL 1906588, at *5. Here, because, as the Court has discussed in previous subsections, Under Armour's UNDER ARMOUR and ARMOUR marks are famous and distinct, this factor strongly suggests the Defendant acted in bad faith. *See generally* ECF 1 ¶¶ 14–27. Therefore, the Court concludes that Defendant acted in bad faith.

Additionally, the allegations in the complaint show that the second element is met. Defendant registered and used the domain name https://lifesarmour.com/. *Id.* ¶¶ 62, 65. The domain name is confusingly similar to Under Armour's trademarks, as it uses the term "armour," spelled like it is in UNDER ARMOUR and Under Armour's other ARMOUR-formative trademarks. Therefore, the Court will enter a default judgment against Defendant on Under Armour's final claim for relief.

### D. Permanent Injunction

Having found Defendant is liable for Under Armour's trademark infringement, trademark dilution, and cybersquatting claims, the Court also finds a permanent injunction is warranted. *See* 15 U.S.C. § 1116 (providing a plaintiff may seek an injunction for violations of the Lanham Act); *see also* § 1125(d)(1)(C) (providing that when a defendant is liable for cybersquatting "a court may order the forfeiture or cancellation of the domain name or transfer of the domain name to the owner of the mark"). The Court may grant a permanent injunction where (1) the plaintiff has suffered irreparable harm, (2) there is no adequate remedy at law, (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) an injunction is in the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021); *see also, e.g.*, *Entrepreneur Media*, 958 F. Supp. 2d at 595–96 (granting a permanent injunction upon default judgment on trademark infringement and unfair competition claims).

Under Armour has shown irreparable harm. The federal statute specifically provides that a plaintiff is "entitled to a rebuttable presumption of irreparable harm upon a finding of a violation." This recent amendment to the Lanham Act was meant to codify the presumption already recognized by many courts in trademark infringement cases. *E.g.*, *Lone Star Steakhouse*

*& Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 939 (4th Cir. 1995) ("[I]rreparable injury regularly follows from trademark infringement."). Therefore, irreparable harm has been demonstrated by the violations found here. Next, the Court finds there is no adequate remedy at law. Where the defendant fails to participate in the litigation, there is a threat of continued infringement, and monetary damages are not sufficient. *E.g.*, *Living Legends*, 2017 WL 3868586, at *6; *Legacy Inv. & Mgmt., LLC v. Susquehanna Bank*, No. WDQ-12-2877, 2014 WL 836077, at *4 (D. Md. Feb. 28, 2014); *Entrepreneur Media*, 958 F. Supp. 2d at 596. Here, Defendant has failed to respond at all since this case was filed and has continued to promote LIFE'S ARMOUR on its website despite Under Armour's multiple demands to cease doing so. ECF 1 ¶¶ 37–43. This conduct demonstrates that legal remedies are not adequate. Additionally, because Defendant is continuing its business in violation of the law, the balancing of hardships also weighs in favor of an injunction. Finally, an injunction is in the public interest to prevent consumer confusion and to secure the integrity of Under Armour's trademark rights. Accordingly, a permanent injunction will be issued.

### E. Statutory Damages

In addition to an injunction, Under Armour seeks statutory damages of $100,000 in conjunction with its cybersquatting claim. The Anticybersquatting Consumer Protection Act provides that, in lieu of actual damages and profits, a plaintiff may seek statutory damages. The Court may award "the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). In addition to compensating the plaintiff for losses, this statutory damages provision is meant to deter future conduct and a court my "weigh the seriousness of the conduct in determining the amount of the award." *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 442 (4th Cir. 2011) (upholding award of $80,000

14

in statutory damages in case of "exceptional and egregious" conduct). The determination of what amount of damages should be imposed is within the district court's discretion. *Emps. Council on Flexible Comp. v. Feltman*, 384 F. App'x 201, 208 (4th Cir. 2010) (upholding $20,000 damage award imposed upon weighing aggravating and mitigating factors).

Under Armour argues that by virtue of Defendant's default and alleged willful behavior the Court should award the maximum available damages. However, in this case Under Armour has not suggested that Defendant highly profited from the https://lifesarmour.com/ domain name or that Under Armour lost significant revenue due to Defendant's conduct. *Compare Punch Clock, Inc. v. Smart Software Dev.*, 553 F. Supp. 2d 1353, 1358–59 (S.D. Fla. 2008) (awarding maximum damages where plaintiff showed significant loss of web site traffic due to defendant's website). Additionally, although the Court has found the https://lifesarmour.com/ domain name confusingly similar to Under Armour's marks, it is not identical and Defendant has not explicitly held itself out as an Under Armour affiliate to consumers, unlike many of the cases cited by Under Armour where maximum damages were awarded. *See Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 512 (E.D. Va. 2003) (awarding maximum damages where defaulting defendant derived revenue from his GMATPLUS websites, which falsely claimed he sold actual unpublished GMAT questions to consumers all over the world); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 585 (E.D. Pa. 2002) (awarding maximum damages where Defendants acted "egregious[ly] . . . blatantly using Plaintiff Louis Vuitton's registered trademark to sell counterfeit Louis Vuitton products"); *CrossFit, Inc. v. Jenkins*, 69 F. Supp. 3d 1088, 1103 (D. Colo. 2014) (awarding maximum damages where Defendant used CrossFit's mark and www.crossfitnutrition.com to imply an affiliation with CrossFit). Still, Defendant's refusal to respond to this litigation suggests its bad intent. *See, e.g.*, *All-Star Mktg. Grp., LLC v. Media*

*Brands Co., Ltd.*, 775 F. Supp. 2d 613, 621–22 (S.D.N.Y. 2011) (reasoning that "an innocent party would presumably have made an effort to defend itself" (citation omitted)). Under Armour previously offered to settle this dispute with Defendant without demanding payment. ECF 11-3. Defendant refused and Under Armour was forced to validate and preserve its rights through the instant action. Considering the need to deter Defendant's conduct in light of all the surrounding circumstances in this case, the Court finds a fair and just award of damages is $20,000.

### F. Costs and Attorneys' Fees

Finally, Under Armour seeks its attorneys' fees and costs. A prevailing plaintiff is entitled to recover costs of the action for Lanham Act violations, and "in exceptional cases" may be awarded reasonable attorneys' fees. 15 U.S.C. § 1117(a). A district court may find a case "exceptional" if, considering the totality of the circumstances,

> (1) "there is an unusual discrepancy in the merits of the positions taken by the parties," based on the non-prevailing party's position as either frivolous or objectively unreasonable; (2) the non-prevailing party "has litigated the case in an 'unreasonable manner'"; or (3) there is otherwise "the need in particular circumstances to advance considerations of compensation and deterrence."

*Ga.-Pac. Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 721 (4th Cir. 2015) (citations omitted). The party seeking fees bears the burden to show that the case is "exceptional" by a preponderance of the evidence. *Verisign, Inc. v. XYZ.COM LLC*, 891 F.3d 481, 484–85 (4th Cir. 2018). Ultimately, the determination of whether a case is "exceptional" falls within the trial court's discretion. *Id.* at 484.

Applying the factors articulated by the Fourth Circuit in *Georgia Pacific*, the Court finds this case is not "exceptional." The first two factors do not support finding an exceptional set of circumstances here. The Court cannot say Defendant's position was "frivolous or objectively unreasonable" or that it approached the litigation in an "unreasonable manner" because Defendant took no position or approach at all. *See Halal Shack, Inc. v. Legends Halal Shack, LLC*, No. SAG-

16

19-3126, 2020 WL 2467358, at *1 (D. Md. May 13, 2020); *Top Tobacco, L.P. v. Thobani*, No. 3:19-cv-275, 2019 WL 5085423, at *3 (E.D. Va. Oct. 10, 2019) (denying claim for attorney's fees upon default, in part, because there was no "affirmative misconduct during the litigation"); *see also Cava Grp., Inc. v. Mezeh-Annapolic*, No. GJH-14-0355, 2017 WL 2493099, at *1 (D. Md. June 7, 2017) (noting that, to satisfy the first factor, a party's claim must be "so unreasonable that no reasonable litigant could believe it would succeed," and to satisfy the second factor, the party's behavior must be "egregious" and, most often, "independently sanctionable"). The third *Georgia-Pacific* factor is also inapplicable. Although Under Armour alleges that Defendant's infringing conduct was "willful," willfulness alone does not warrant an award of attorney fees. *See* § 1117(a) (explaining that a willful violation of § 1125(c) entitles a plaintiff to recover costs of the action but a greater showing is required for attorneys' fees). The Court is satisfied that the injunction and imposition of statutory damages will sufficiently deter Defendant's future conduct. Under Armour, is, however, entitled to its costs for this action, and is instructed to file a bill of costs in accordance with this Court's local rules.

### IV. CONCLUSION

For the reasons set forth above, Under Armour's Motion for Default Judgment will be GRANTED as to Defendant's liability and GRANTED as to Under Armour's requests for a permanent injunction and for costs. The motion is GRANTED IN PART as to Under Armour's request for damages and DENIED as to Under Armour's request for attorneys' fees. A separate implementing Order and a Permanent Injunction Order follow.

Dated: May 21, 2021                                          /s/
                                                                 Stephanie A. Gallagher
                                                                 United States District Judge